**Thomas STEELE, Appellant,**

v.

**D.C. TIGER MARKET,
et al., Appellees.**

**No. 01–CV–1193.**

District of Columbia Court of Appeals.

Argued May 19, 2003.

Decided July 15, 2004.

---

Joan Harvill, for appellant.

David L. Rubino, Rockville, MD, with whom Amy Leete Leone was on the brief, for appellees.

Before FARRELL, RUIZ and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Thomas Steele was shopping for groceries at D.C. Tiger Market when the store's security guard, off-duty Metropolitan Police Officer Timothy Harris, stopped him on suspicion of shoplifting. According to Harris, he noticed a bulge in the front of Steele's "puffy" jacket that had not been there when Steele entered the store. After Steele refused to open his jacket for Harris and attempted to walk away, Harris allegedly grabbed him, spun him around, and searched him. No incriminating evidence was found on Steele, who was released without being charged with shoplifting.

Steele sued Harris and D.C. Tiger Market for damages in Superior Court, claiming, *inter alia*, that as a result of the incident he suffered from debilitating posttraumatic stress and depression for which he had to seek psychiatric treatment. Steele stated claims against Harris for assault and battery and false arrest and against D.C. Tiger Market for negligent hiring, training, and supervision. The case was tried to a jury, which returned a verdict for the defendants. From the judgment entered on that verdict, Steele has appealed.

Steele contends that the trial judge committed reversible error in two respects. First, Steele charges that during jury selection, the judge discriminated against potential jurors who had received treatment for depression or other mental health problems. The record shows, however, that the judge excused the jurors in question for reasons other than their psychiatric histories. Second, Steele complains that the judge unduly restricted the testimony of his expert on police procedures. We find to the contrary. We hold that the judge ruled appropriately and did not abuse her discretion in precluding Steele's expert from explaining the law governing arrests and investigative stops to the jury and from expressing his legal conclusion that Harris lacked probable cause or reasonable articulable suspicion to detain Steele for shoplifting.

I.

During the voir dire, the trial judge posed a series of questions to potential jurors for the purpose of discovering bias, prejudice, or other grounds for disqualification. One of those questions asked if any venire members or their close relatives had ever been treated for a "mental injury" or been under the care of a psychiatrist or other mental health provider. Citing three jurors who responded affirmatively to this question and who were excused for cause after they were interviewed at the bench—Jurors 076, 094, and 155—Steele contends that "persons with a history of psychiatric treatment were systematically struck for cause from the jury panel, even though they specifically stated their psychiatric treatment would not interfere with their ability to render an impartial verdict."

Although he objected when the judge excused Jurors 076 and 094, Steele did not raise his claim of systematic discrimination in the trial court. Assuming for the sake of argument that Steele has preserved the claim, we discern from the transcript of the voir dire that it is without merit. The jurors in question were not excused because of their psychiatric treatment history. Juror 076 was excused on the motion of defense counsel because she admitted she would "probably" identify or

sympathize with Steele if he was suffering from depression as he claimed. Juror 094 was excused because he reported a past issue with anger management and his demeanor at the bench—"his affect" and the "cadence of his voice," as the judge noted on the record—struck both defense counsel and the judge as disturbing. Juror 155 was excused without objection from either side because she preferred not to endure jury deliberations that might upset her medical condition, for which she was taking psychotropic drugs.

 Nothing in this fairly supports Steele's claim of systematic discrimination against persons with a history of psychiatric treatment. The judge's rulings reflect a legitimate and reasonable concern to select jurors who would be able to fulfill their responsibilities. "A trial judge ... has broad discretion in deciding whether to excuse a juror for cause" to achieve that goal, among other reasons because the judge's assessment of a potential juror's demeanor plays "such an important part" in evaluating the juror's ability to serve. *Rease v. United States*, 403 A.2d 322, 325 (D.C.1979) (quoting *Ristaino v. Ross*, 424 U.S. 589, 595, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976)). As the record before us in this case shows no abuse of that discretion—and, we might add, no substantial prejudice to Steele either—he is not entitled to relief on appeal on account of the judge's rulings in voir dire. *See Lewis v. Voss*, 770 A.2d 996, 1005 (D.C.2001).

## II.

Because D.C. Tiger Market's security guard Timothy Harris was an off-duty Metropolitan police officer, Steele called Robert Klotz, a former senior official in the Metropolitan Police Department, to testify as an expert in the area of "police procedures." Following a voir dire examination into Klotz's qualifications, the defendants raised two objections to his anticipated testimony.

The defendants' first objection was that Klotz was not qualified to render opinions as to "private security matters" such as whether D.C. Tiger Market should have trained Harris itself instead of relying on his having been trained as a police officer. At his deposition, Klotz had testified that he did not "hold [him]self out as an expert when it comes to private security matters" and that he was not offering an opinion that "the corporate defendant should have trained this police officer." In response to the defendants' objection, Steele disavowed any intention to elicit such opinions from Klotz at trial. The judge thereupon ruled that Klotz would not be allowed to testify "about whether Tiger Market should have trained [Harris] or whether they trained him improperly."

The defendants' second objection was that Klotz should not be allowed to render opinions as to whether Steele had been arrested or whether there was probable cause for his arrest. In response, Steele acknowledged that he planned to ask his expert to explain the legal meaning of such terms as "arrest," "probable cause," and "reasonable articulable suspicion" and then to opine that Harris had arrested Steele at the D.C. Tiger Market without the requisite legal justification. As part of his planned inquiry, Steele intended to ask Klotz to explain "what actions a suspect must take to constitute the crime of shoplifting according to [D.C.Code § 22–3213 (2001)]," and to testify that Harris did not see Steele take such actions. The trial judge ruled, however, that the expert witness would not be permitted to define and "interpret the law," because that was "the function of the Court." Nor would the witness be permitted to testify whether, in his opinion, there was an arrest or probable cause to arrest in this case; such testi-

mony, the judge reasoned, would not assist the jury in performing its role as trier of fact.

The judge's rulings left considerable leeway for Steele to question Klotz about pertinent police training and procedures, among other matters.[1] When Klotz resumed the stand, his testimony at times seemed to stretch, and perhaps overstep, the boundaries that the judge set. Thus, while Klotz was prohibited from defining "arrest," "reasonable articulable suspicion" and "probable cause," he was allowed to testify that police regulations require an officer to have reasonable articulable suspicion to stop someone and probable cause to make an arrest.[2] Klotz then was allowed to opine that based on his review of Timothy Harris's deposition, Harris did not "know the elements of shoplifting" or "what probable cause was to make an arrest for shoplifting." Klotz testified that Harris "had it confused with reasonable suspicion." Klotz also was allowed to state his opinion that Harris was not "acting according to police rules and regulations

when he stopped Thomas Steele," nor when he searched Steele.

Consistent with her earlier rulings, the judge did not permit Klotz to render an express opinion that Harris lacked probable cause or reasonable articulable suspicion to detain Steele. In particular, the judge sustained defense objections to the following two questions that Steele attempted to ask Klotz:

If somebody enters a store with a coat that appears to be close about the body and then, when they leave the store, the coat is puffier looking than when they entered, is that, within M.P.D. rules and regulations, grounds to stop a person?

Does a puffy coat constitute reasonable articulable suspicion to stop someone?

Steele argues that since experts are permitted to render opinions that embrace the ultimate issues in a case, the judge erred in refusing to let Klotz explicate the law and opine that Harris lacked probable cause or reasonable articulable suspicion to detain him for shoplifting.[3] We do not agree.

1. The judge specifically agreed, for example, that Steele could ask Klotz whether police officers are trained to distinguish between reasonable articulable suspicion and probable cause and what they are trained to do when they believe they have one or the other.

2. Klotz testified:

An officer is required to have what is known as articulable reasonable suspicion that a crime has been or is about to be committed based on his background and experience, based on his observations. He doesn't need probable cause, but he needs more than a vague feeling or a hunch that something's wrong. He has to be able to describe, based on his experience and what occurred, what led him to the conclusion that he needed to make a stop.... Once an officer has made a stop, if he has additional articulable suspicion that the person may be armed and pose a threat to the officer,

he is allowed to frisk him; that is, to pat down the outside of his clothing to determine whether or not he has a weapon that could inflict any injury on the officer or anybody else. That's why they call it stop and frisk, usually.

Klotz further testified that police regulations distinguish reasonable suspicion from probable cause and that reasonable suspicion is not sufficient basis for an arrest. He also was permitted to testify that a suspect did not have to be handcuffed or transported to a police station to be considered under arrest.

3. Steele also complains that the judge erred in preventing Klotz from offering opinions as to whether D.C. Tiger Market should have trained Harris or investigated his qualifications to work as a security guard. Especially given Steele's acquiescence when D.C. Tiger Market asked the judge to preclude Klotz from opining on private security matters, we perceive no error in the judge's ruling.

■■ The admission or exclusion of expert testimony is committed to the informed discretion of the trial judge, whose ruling, we have said, "should be sustained unless it is manifestly erroneous." *In re Melton,* 597 A.2d 892, 897 (D.C.1991) (en banc) (internal quotation marks and citation omitted); *see also Green v. United States,* 718 A.2d 1042, 1051 (D.C.1998) ("[U]nder any case concerning the admissibility of expert testimony, we will review the trial court's decision for abuse of discretion, whether the trial court admits or excludes the proffered testimony."). In a jury trial, the judge must exercise discretion to decide whether the proffered expert testimony is likely to assist the jury in the performance of its duties—that is to say, in understanding the evidence, determining the facts that must be found and rendering its verdict. *See, e.g., Carter v. United States,* 614 A.2d 913, 919 (D.C. 1992).

■■ Expert opinion testimony is not inadmissible "merely because it amounts to an opinion upon ultimate facts." *Lampkins v. United States,* 401 A.2d 966, 970 (D.C.1979); *accord,* FED. R. EVID. 704(a) ("Except as provided in subdivision (b) [regarding testimony about the mental state or condition of a defendant in a criminal case], testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). Rather, "an expert may state a conclusion on such facts provided the conclusion is one that laymen could not draw." *Lampkins, supra; see also Ibn–Tamas v. United States,* 407 A.2d 626, 632 & n. 13 (D.C.1979). Such opinion testimony often may be of great value.

■■ Conversely, however, "an expert may not state his opinion where the jury is capable of drawing its own conclusions from the evidence." *Lampkins,* 401 A.2d at 969. "[I]n cases in which the primary facts are accurately presented to the jury and the jurors are as capable of understanding and drawing correct conclusions from the facts as an expert witness, the trial court may exclude" the expert witness's conclusions. *Payne v. Soft Sheen Prods., Inc.,* 486 A.2d 712, 727 (D.C. 1985). In short, expert testimony is admissible to help the jury to do its work and not to do the jury's work for it. Admittedly, this guiding principle is easier to state in the abstract than it is to apply in practice, where the question is usually one of degree—hence the need for a considerable measure of judicial discretion. That said, "we find objectionable questions which, in effect, submit the whole case to an expert witness for decision." *Lampkins,* 401 A.2d at 970. *See also* FED. R. EVID. 704 advisory committee's note. "When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994).

■■ In line with these principles, courts uniformly hold that "the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Id.* (internal quotation marks and citations omitted). Succinctly put, "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Christiansen v. City of Tulsa,* 332 F.3d 1270, 1283 (10th Cir.2003) (upholding exclusion of expert's opinion that a defendant acted recklessly) (internal quotation marks and citation omitted). *See also* JOHN W. STRONG, ET AL., 1 MCCORMICK ON EVIDENCE § 12 (5th ed.1999). "Each

courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart v. Washington Metro. Area Transit Auth.*, 324 U.S.App. D.C. 241, 247, 112 F.3d 1207, 1213 (1997). "In no instance can a witness be permitted to define the law of the case." *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir.1988). And it is the core function of the jury, after it is properly instructed on the relevant legal standards, to apply those standards to the facts found in order to reach a verdict. "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion·that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart*, 324 U.S.App. D.C. at 246–47, 112 F.3d at 1212–13.

 Rather than being helpful, expert testimony purporting to state or apply the governing law risks misinterpreting that law and confusing or misleading the jury.

*See, e.g., Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 370 n. 8 (D.C.1980) (observing that an expert witness who opined as to proximate cause "did not understand the legal meaning of the term. His opinions would have been more useful to the jury had they been confined to the issue of causation-in-fact."). "The danger is that the jury may think that the 'expert' in the particular branch of the law knows more than the judge—surely an inadmissible inference in our system of law." *Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 512 (2d Cir.1977).[4] There is also the danger that the jury will be overawed and "simply adopt[ ] the expert's conclusions rather than mak[e] its own decision." *Specht,* 853 F.2d at 809.

 "[T]he line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright." *Burkhart,* 324 U.S.App. D.C. at 246, 112 F.3d at 1212.[5]

**4.** Indeed, as the Tenth Circuit added in *Specht, supra:*

> If one side is allowed the right to call an [expert] to define and apply the law, one can reasonably expect the other side to do the same.... [I]t can be expected that both legal experts will differ over the principles applicable to the case. The potential is great that jurors will be confused by these differing opinions, and that confusion may be compounded by different instructions given by the court....

853 F.2d at 809 (citations omitted).

**5.** *See generally* Benjamin J. Vernia, Annotation, *Admissibility of Expert Testimony Regarding Questions of Domestic Law,* 66 A.L.R. 5th 135 (1999). Nothing in this opinion is intended to cast doubt on the need for expert testimony in legal and medical malpractice cases, for instance, to prove the applicable standard of care, a deviation from that standard, and a causal relationship between the deviation and the harm alleged to have occurred. *See Mills v. Cooter,* 647 A.2d 1118, 1123 (D.C.1994) (legal malpractice); *Washington v. Washington Hosp. Ctr.,* 579 A.2d

177, 181 (D.C.1990) (medical malpractice). Such testimony sometimes cannot help touching on legal principles that underlie the standard of care or that affect the question of causation. The Court of Appeals of Maryland has held, for example, that "[b]ecause an expert opinion on the standard of care in an attorney negligence case is often based upon the expert's interpretation of the law, experts in such cases may state their opinion on the law as a foundation for their opinion on the standard of care." *Franch v. Ankney,* 341 Md. 350, 670 A.2d 951, 956 (1996). But in that case, "if an expert's opinion testimony is based upon a premise which is shown to be unsound or faulty, the judge should strike the testimony." *Id.* at 958; *cf.* 5 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 33.17 at 133 (5th ed. 2000) ("In a legal malpractice action, [expert] testimony on issues of law should be precluded."). *See generally* Michael A. DiSabatino, Annotation, *Admissibility and Necessity of Expert Evidence as to Standards of Practice and Negligence in Malpractice Action Against Attorney,* 14 A.L.R.4th 170 (1982).

As *Sponaugle, supra,* illustrates, however, it is important to pay close attention to the terminology that the expert witness employs. Where "the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular," the likelihood is high that exclusion of the testimony will be appropriate. *Torres v. County of Oakland,* 758 F.2d 147, 151 (6th Cir. 1985); *accord, Burkhart, supra.* Thus the advisory committee's note to FEDERAL RULE OF EVIDENCE 704 recognizes the propriety of "exclud[ing] opinions phrased in terms of inadequately explored legal criteria" and offers the following example to illustrate the difference between permissible opinion testimony regarding ultimate factual issues and an impermissible legal conclusion:

> [T]he question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

FED. R. EVID. 704 advisory committee's note. The difference is that the first question merely references a legal standard, while the second question breaks down that legal standard into its *factual* components. An expert witness may be qualified to answer the factual question.

Although the line of demarcation may be less than bright in some cases, we do not find it so in this case. Steele was not barred from presenting expert testimony concerning, for instance, the *modus operandi* of shoplifters, the training police receive in detecting shoplifters, or the procedures police are taught to follow in investigating shoplifting or conducting stops and arrests. That sort of testimony is admitted routinely in our courts.

*See, e.g., Griggs v. United States,* 611 A.2d 526, 527–28 (D.C.1992) (approving admission of expert testimony regarding the *modus operandi* of drug traffickers); *Lampkins, supra* (*modus operandi* of pickpocket teams). But Steele did not seek to present such testimony. Rather, in asking Klotz to define legal terms of art—"arrest," "reasonable articulable suspicion," "probable cause," and the statutory offense of "shoplifting"—and then to opine that, on the specific facts presented by other witnesses' testimony, Harris did not have reasonable articulable suspicion or probable cause to arrest him for shoplifting, Steele was attempting to elicit legal conclusions from his expert.

Other courts have found similar testimony to be objectionable. For example, in two civil rights actions, *Estes v. Moore,* 993 F.2d 161 (8th Cir.1993), and *DiBella v. County of Suffolk,* 574 F.Supp. 151 (E.D.N.Y.1983), the trial courts ruled that expert witnesses would not be allowed to render opinions on whether there existed probable cause to arrest. Upholding the trial court in *Estes,* the court of appeals said:

> While the existence of probable cause is a mixed question of law and fact, the ultimate conclusion is a question of law. The proposed testimony was, therefore, not opinion testimony but rather it was a statement of a legal conclusion. [Citation omitted]

*Estes,* 993 F.2d at 163. The district court in *DiBella* likewise applied the rule that "expert witnesses could not be called to instruct the jury as to applicable principles of law" in holding that "whether an officer had reasonable cause to believe that DiBella had committed an offense is hardly susceptible of expertise...." 574 F.Supp. at 152, 153. "In the last analysis," the court added, the expert's opinion would turn "upon what a hypothetical reasonable

man would do under the circumstances. With such a standard the jury is quite familiar and needs no help from an expert." 574 F.Supp. at 153.[6] *See also United States v. Williams,* 343 F.3d 423, 435 (5th Cir.2003) (in the prosecution of a sheriff for shooting an unarmed suspect, the trial court erred by admitting expert testimony that the shooting was unreasonable, since "[r]easonableness under the Fourth Amendment or Due Process Clause is a legal conclusion"); *Hygh v. Jacobs,* 961 F.2d 359, 364 (2d Cir.1992) (in a civil rights action against a police officer for excessive use of force, the trial court should not have allowed an expert to define "deadly physical force" or testify that the use of force was not "justified under the circumstances" and was "totally improper").

█ In accordance with precedent in this jurisdiction and elsewhere, we hold

that the trial judge in this case did not abuse her discretion in precluding Steele's expert witness from interpreting and applying the governing law. As the judge recognized, such testimony was not calculated to help the jury do its job. It is the responsibility of the judge alone to instruct the jury on the law and the responsibility of the jury alone to apply that law to the facts.

### III.

As neither of Steele's contentions entitles him to relief, we affirm the judgment on appeal.

---

**6.** Here, too, Steele's cause of action for false arrest depended on the objective reasonableness of the arresting officer's conduct or belief. *See District of Columbia v. Murphy,* 635 A.2d 929, 931–32 (D.C.1993); STANDARD-IZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA § 18.03 ("Justification for an Arrest by Law Enforcement Officer") (2002 Rev. Ed.).